[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Nature of Proceedings
On April 16, 2002, Mariah L. became the subject of this petition by which the Department of Children and Families (DCF) seeks to terminate the parental rights of Jacqueline L. and Edward R., mother and unacknowledged putative father, so that she would be freed for a permanent home through adoption. Born 10//01, Mariah spent her first two months of life in the hospital, suffering from withdrawal from methadone, legally prescribed for her mother for nearly a decade. When two and half months old and ready for discharge from the hospital, Mariah was placed in foster care pursuant to an Order of Temporary Custody secured by DCF. This was confirmed on 1/4/02 with the agreement of the mother who was present and represented by counsel. On 2/5/02, at the originally scheduled hearing on the underlying petition alleging that Mariah was both neglected and uncared-for, within the definitions of Sec. 46b-120 of the Conn. Gen. Stats. (Rev. 2001), neither parent appeared. The matter was continued for two weeks, and again, neither parent appeared. On both occasions, Jacqueline's attorney was present. Lacking any excuse for their non-appearance, the court (Conway, J.) entered a finding by default that the child was both neglected and uncared-for, and committed her to DCF.
Two months later, after Jacqueline overdosed on prescription drugs for the second time since the baby's birth and was hospitalized on the locked unit of the Connecticut Mental Health Center (CMHC), DCF filed this petition.
Facts
Evidence offered in two days of trial, October 22 and 23, 2002, and judicial notice taken of the earlier record in this court concerning this child and her sibling, Kristina L.M., support the finding of the following facts.: CT Page 14385
1. - Before Mariah's birth:
Jacqueline L. was an only child of parents who divorced when she was two. She lived with her mother until she was 12 when conflict with a stepfather caused her to move in with her father. A year later, when her alcoholic father divorced her stepmother, she ran away from home, but not to return to live with her mother.
At 20 she gave birth to the first of five children of four different paternities. The four children born before Mariah are all in the custody of their respective fathers or paternal relatives. She has not seen her 16 year old son "for a while" and has not seen her 14 and 12 year old daughters "in years". Her fourth child, Kristina, like Mariah, was born addicted to methadone, spent two months in the hospital after birth, and was placed immediately in DCF foster care under an Order of Temporary Custody. Like Mariah, she became subject to a petition to terminate parental rights but that petition was withdrawn when a paternal aunt was approved both by DCF and Jacqueline. Custody and guardianship were transferred to that aunt two months before Jacqueline became pregnant with Mariah and she currently maintains contact with that child.
Jacqueline completed 9th grade and later secured her G.E.D. but has never kept a job longer than six months. She has been unemployed since 1989 when she was 23 years old and is currently supported by Supplemental Social Security (SSI) which she claims is "due to having a `bad heart and HIV'." (State's Exh. H, p. 2.)
She began using marijuana at 13 and heroin and cocaine when she was 15. (State's Exh. I, p. 1). She takes a wide variety of prescription drugs for depression, anxiety, sleeplessness and migraine headaches as well as methadone at a non-diminishing daily dose of 110mgs which her inpatient clinician at CMHC testified was a "pretty heavy dose". While there is no plan to diminish that dosage it was, in fact, increased to 120 milligrams during her pregnancy with Mariah to ensure that its effectiveness was not diminished. Her tendency to self-medicate combined with her opiate addiction resulted in "a recent history of multiple unintentional overdoses, while she was pregnant with" Mariah. (State's Exh. I, p. 1.)
When she was six months pregnant with Mariah, she passed out in a store from an overdose of benzodiazepines ("benzos"), the third time since becoming pregnant. For the third time she was taken to the Emergency Room at Yale New Haven Hospital where she was admitted since she had had ". . . two similar presentations at the Yale New Haven Hospital emergency room CT Page 14386 prior to this current episode". (State's Exh. G, p. 2.) This time she was transferred to Yale Psychiatric Hospital (YPH) where she was de-toxed from Klonopin and Phenobarbital, both "benzos". After two months at YPH, she was involuntarily committed to the closed ward at CMHC for the last month of her pregnancy when ". . . it was deemed that she was presenting a danger to her unborn child." (State's Exh. G., p. 2.) On her arrival there she was prescribed only HIV medications, in addition to methadone. Her clinician at CMHC, Maureen Butterworth, found on admission that Jacqueline had a "poor understanding of her addiction", continually denying that she could be a drug addict since all of her pills had been given by prescriptions. She displayed "no insight" into the impact of her continued use of these drugs. Mariah was full-term and normal weight, although her withdrawal from methadone necessitated that she spend her first two months of life in the hospital.
2. - After Mariah's birth and before institution of this action:
After giving birth, Jacqueline, homeless, was given a choice of going to a shelter or to the open (subacute) unit at CMHC which would provide her with a place to sleep and intensive day programs. Despite these supports, she again overdosed on Klonopin and was hospitalized at YPH from January 13 to 15, 2002. She returned to the open unit at CMHC but not long after was again found "woozy" on Klonopin and was returned to the closed ("acute") unit at CMHC under a doctor's certificate. This time a probate court commitment was not necessary since Jacqueline voluntarily elected to stay on the closed unit for two months. By the time of her discharge on 3/18/02, she was again detoxed from Klonopin, which had been prescribed for anxiety, and Furaset for headaches. She had found an apartment and was planning to resume her daily visits to the methadone clinic as her only continuing therapy. Three weeks later, on 4/5/02, she was back. She had appeared confused at the methadone clinic and was sent to the emergency room where she tested positive for barbiturates, benzos and amphetamines. During the intake process when she was told she could not go home, "she became angry and began yelling, worried that hospital staff was going to dispose of her medications." (State's Exh. K, p. 1.) In her possession were bottles of Xanax, Klonopin, Fioricet, and Perphenazine/amitriptyline, and she admitted using oxycodone 80mg. (Ibid.) She told the hospital staff she had become hysterical because her grandmother had died the night before and her father on 3/26/02. (The latter disclosure is at variance with the history given Dr. Nancy Randall during the court-ordered evaluation two months later which included the fact that she found her father dead during a visit when she was 17, which would have been in 1983.) She was then readmitted to the closed unit of CMHC where she remained for six weeks, during which the instant petition was filed. CT Page 14387
3. - After institution of this action:
On her discharge from CMHC on 5/16/02, she agreed with the CMHC staff that she needed an inpatient drug program, and went directly from CMHC to the STAR Program at Connecticut Valley Hospital, from which she had been discharged three years earlier. (State's Exh. I, p. 1)
Upon admission to STAR., she described her life when not in a residential treatment program:
 "Prior to entering the STAR Program, patient arose by 6:30 a.m. She attended methadone maintenance treatment at the APT Foundation and then would return home and stay in bed until 8 p.m. Patient generally used substances while alone. Sometime after 8 p.m. patient would fall asleep." (State's Exh. H., p. 4.)
Marian Ellicott, her counselor at STAR, testified that Jacqueline had a hard time controlling her anger and following direction. While never physically abusive, after fifteen days in the program her verbal abuse to peers and staff necessitated a "special behavioral treatment plan", but a week after it was instituted, she "blew up" at a peer and the staff decided she should leave. Ms. Ellicott testified that while this kind of behavior was not unusual for patients with this diagnosis, the program could not jeopardize the treatment of the 40 other "fragile" women needing a "safe environment" free of intimidation. Jacqueline was not informed of her discharge until after her appointment there with Dr. Randall so that she would not be unduly upset during the clinical evaluation. While at STAR, Jacqueline acknowledged having a problem with anger control, but never acknowledged any current substance abuse problem. According to the witness, "If you don't own your behavior, there's no reason to change it." In all, Jacqueline stayed 32 out of an anticipated 52 days but was not regarded as having successfully completed the program.. Had she stayed longer, she would have gained nothing and her presence would have impacted the rest of the population, according to this witness. An additional problem was her sleepiness, "nodding", during programs. When staff suggested that she voluntarily reduce her methadone dose, Jacqueline refused, denying that she had been "nodding off". Her condition upon discharge was "minimally improved.". (Id, p. 3..) Before she left the STAR program, appointments were made for her to keep soon after her discharge on 6/18/02 at Nathan Smith, her medical clinic, CMHC for psychiatric needs, and the APT foundation for her methadone treatment. In addition, she expressed her intention to attend 12 step meetings. (Id.) In its discharge summary, STAR found her to be "minimally CT Page 14388 improved" (State's Exh. I., p. 3) with a prognosis that was ". . . poor due to her ongoing emotional deregulation, and her lack of utilizing a healthy support network in the community." (Id., p. 4.)
On the day before her discharge from STAR, she was evaluated, by court order, by Dr. Nancy Randall. (State's Exh. F-i.) Although she told the evaluator that she had only been arrested for trespassing and possession, (Id., p. 5), other evidence established over a dozen arrests between 1988 and Maria's birth, with jail sentences imposed in half of these. (State's Exh B.) Jacqueline told Dr. Randall that there were no charges pending against her, but the documentary evidence shows charges for larceny, possession and sale of illegal drugs as well as the latest charge for failing to appear, all still pending since November of 2000. (Ibid.)
Three weeks after her discharge from STAR, Jacqueline was again arrested and was incarcerated from July 8 to 26. (State's Exh. J, p. 6.) At the time of this trial, the outcome from this arrest was unknown. (Testimony of DCF social worker Handy.) Her counselor at the APT Foundation, which provided methadone maintenance, testified that Jacqueline had reentered their program August 6, after her July, 2002 prison stay. The goal set for her was to remain free of opiates and "benzos", but she continued to test positive for the latter. The APT witness testified that to be able to stay off these harmful drugs, Jacqueline would need to establish a sustained "clean time", secure a stable support system of friends or family which the witness said "could use building"); and live a constructive life style with some form of meaningful structure of paid or volunteer work. She needed to wean herself from prescribed benzos which she admitted taking in a non-prescribed manner. (Testimony of Peggy Carpenter.) As recently as two weeks before trial, Ms Carpenter stated, "We have seen evident of benzo abuse." The witness at first stated she did not think a diagnosis of borderline personality would make recovery more difficult; later she testified that since people with borderline personalities become anxious, taking benzos for anxiety would make recovery more difficult. She also testified that taking methadone made Jacqueline more subject to adverse reaction from other prescribed drugs such as benzos. She was unable to estimate how long Jacqueline could exclude benzos from her life.
Gail Chotiner, Jacqueline's current counselor at CMHC, met her when she was on the locked acute unit following two emergency room admissions from over medicating in one week in March, 2002. She purposely did not review Jacqueline's old CMHC records when they first met in so as "not to be prejudiced.". Upon Jacqueline's discharge in May, 2002, this witness had CT Page 14389 facilitated her entry into the STAR program. She testified that Jacqueline had a dual diagnosis of opiade and benzo dependency, in addition to a borderline personality disorder. Since reentering CMHC as an outpatient, following her discharge from STAR, Jacqueline has not attended daily intensive outpatient group therapy because the staff "felt individual therapy was best" for her. At the time of testifying, the witness was meeting Jacqueline weekly downstairs in the lobby, outside of the metal detector, and escorting her into a secure first floor office instead of upstairs in her office. This procedure had been arranged after an "episode" with a patient on the acute unit. Currently the mother's legal source of benzo prescriptions (doctors at Nathan Smith where she receives medical care) had agreed with the CMHC treatment staff that benzos should not be prescribed at this time. According to this witness the mother had "done really well", making "tremendous progress" for the last four weeks, but could not predict that such progress was reasonably likely to be sustained. The dual diagnosis made achieving the goal of a substance-free, independent life more difficult, predicting "It would take a while" but noting that in the last four to five weeks she had avoided being late or confused about her appointments, had no further "lobby tantrums", displayed an ability to discuss "her issues" therapeutically, and has had no further overdosing episodes. This witness, however, was unaware that Jacqueline's July arrest had not yet been resolved and testified it would be "troubling" if she knew that one of the pending charges involved drugs. She also was given the impression that Jacqueline's stay at STAR had been successful.
The day before her discharge from STAR, Jacqueline was evaluated by Dr. Nancy Randall, clinical psychologist, pursuant to an order of this court. Dr. Randall was not made aware that Jacqueline was being discharged the next day. Dr. Randall confirmed that Jacqueline's dual diagnosis required dual treatment and that while she was capable of learning, her borderline I.Q. would require a great deal of repetition of anything to be learned and it would take longer for her to put any learning into effect. Although her last admitted ingestion of Klonipin was just a month before this evaluation, Jacqueline told Dr. Randall that she thought she had done everything she needed to get Mariah back. She did not agree that she needed residential treatment, but thought outpatient would be enough. Even before Jacqueline signed waivers for the evaluator to speak with her counselors, Dr. Randall had concluded that her risk for relapse was very high. (State's Exh. F-1, p. 9.). "She is at high risk for further relapses, as well as difficulties in meeting her own basic and psychological needs. She is clearly unable to provide for a child at this time." (Id, p. 1 0). Dr. Randall described her substance abuse problem as "very serious" but is minimized by Jacqueline because the drugs she has taken since her last admitted use of heroin in 2001 CT Page 14390 were not illegally obtained:
 "Her risk for relapse at this point is very high . . . There is little evidence in this evaluation to suggest that Ms. L. would be able to achieve a degree of personal rehabilitation to allow her to parent this child within a reasonable period of time." (Id. P. 11.)
Jacqueline initially declined to sign waivers for Dr. Randall to speak with her various clinicians. Later she did so and Dr. Randall spoke with Maureen Butterworth, but the release provided to Gail Shartner[sic] (presumably Chotiner) was not sufficiently specific to enable her to speak to Dr. Randall. The information Dr. Randall did obtain required no changes in her conclusions or recommendations. (State's Exh. F-2) Her Addendum to the original report (Ibid) quotes Ms Butterworth as stating:
 "The patient's hospital course was notable for poor insight into her addiction to prescription medications because these medications are `prescribed by a doctor.' Additionally one got the impression that the patient did not have the level of investment necessary for recovery. Rather, she entered the program to impress the court in her bid to recover her child." (Id., p. 2.)
In cross examination, Dr. Randall testified that Jacqueline's recovery is unlikely while she is living alone. She first needs to learn the necessary skills while living in a controlled residential setting. Information that Dr. Randall did not have when doing the evaluation (the arrest in July, 2002, the involuntary hospitalization in the last months of her pregnancy, her unsuccessful discharge from STAR) would "very much bolster" the conclusion that she is not in a position to care for Mariah. At minimum it would take more than a year before Jacqueline could begin to assume care for her daughter (beginning with the structure of in-patient treatment, followed by a year of sobriety when living on her own) and it would be harmful to Mariah to be removed from her primary caretakers at the age she would be then (30 months): "Most children who have been disrupted at that age have significant problems".
Social worker Handy testified to the services that were offered to the mother during the periods when she was not inpatient in a treatment center or incarcerated. Referrals were made for housing, which Jacqueline succeeded in obtaining in March, 2002. Because she was already involved in so many medical, psychiatric and substance abuse treatments, further CT Page 14391 referrals to these facilities were not indicated. Ms Handy was unable to monitor her compliance at the APT Foundation because of the mother's withdrawal of her releases of information so she had no information as to drug abuse since her discharge from STAR. DCF facilitated visits which, when decreased from weekly to bi-weekly, have been regularly kept for the three months preceding trial, with DCF providing mother with a bus pass.. The mother's interaction with the child is appropriate, and has improved with the regular contact.
Ms Handy's only contact with the named father was by telephone. He informed the social worker that he had met the mother in the methadone program. When she had informed him of her pregnancy, he advised her to secure an abortion. He stated that he had "problems" and could not be a resource. Although he stated he thought the mother was crazy, he had no objection to her regaining custody but also did not object to the termination of his parental rights. When he expressed an interest in seeing Mariah, he was asked to come for an initial appointment as a preliminary to any visiting. He never appeared nor did he call again. When she telephoned him, she heard him say in the background "I'm not home".
On her own behalf, Jacqueline offered a letter from a friend who was unable to testify (Respondent's Exh. 1), pleading for her to be given a chance to parent her daughter. An eloquent witness on her own behalf, Jacqueline corrected some of the testimony given by experts: "I do not nod off with methadone", explaining that another medication that she took might have given that impression. She acknowledged that she had "a very bad past history" but felt she could change. She asserted that she was in touch with the caretaker of her daughter Kristina, but did not explain why she had no plan for regaining custody of that child in whom her parental rights had not been terminated. Perhaps that was explained by her statement, "I couldn't bear to see her [Mariah] put up for adoption."
Findings:
Pursuant to subsection (j) of Sec. 17a-112 of the Conn. Gen. Stats. (Rev. 2001), the record supports, by clear and convincing evidence, the following findings:
1. Reasonable efforts to reunify:
As to Edward R: DCF has made reasonable efforts to unify the child with the putative father. It was reasonable and appropriate for DCF to request an initial interview with him as the first step in initiating contact with both the child and the Department. No further efforts could be made in view of his failure to keep that appointment and his voiced CT Page 14392 unwillingness to be considered a resource for Mariah and lack of objection to the plan of termination and adoption.
As to Jacqueline L.: DCF made all reasonable efforts to reunify the mother with Mariah. When she was not incarcerated or in inpatient treatment, referrals were made to assist with housing, to arrange transportation for visits, and to encourage compliance with her various treatment sources. Placement with the mother could not be considered until her drug, health and legal problems had been resolved to the point that a stable and secure environment for this child could be reasonably predicted. Since no such prediction could reasonably be made either at the time the petition was filed or at the time of trial, further efforts were not appropriate.
2. Best interests of the child:
Social Worker Handy testified to the observed bond with the foster parents who want, and have been approved, to adopt Mariah. This contrasts with the cordial but "visiting relationship" with her mother that has developed since bi-weekly visitation became regular, three months before trial.
Dr. Randall's testimony was unequivocal that the child, after a year of foster care, needs permanency to develop optimally, and that waiting another year and a half before any return to her mother could even be initiated would present significant hazards for her.
While the mother's plea to be given a chance to raise this child was undoubtedly sincere, three months of relative freedom from drug dependence cannot outweigh a twenty year history of drug abuse, when combined with her dual diagnosis, lack of structure in her life, and the absence of support from family or community. Her continued minimizing of her problems combined with her low intellectual functioning compels the conclusion reached by the expert witnesses that a sustained recovery is unlikely. Delaying permanency for this child for another year while waiting for such an unlikely outcome is clearly detrimental to a child of this age. Therefore it is clearly in Mariah's best interests for her parents' rights to be terminated without further delay so that she may have the security of adoption before she reaches the critical age of two and a half.
3. Statutory grounds to terminate parental rights:
As to Edward R.: The evidence supports by clear and convincing proof that the named putative father has abandoned Mariah, not only in the CT Page 14393 relative sense of the statute (a failure to maintain a "reasonable degree of interest, concern or responsibility as to the welfare of the child") but also in the absolute sense of the common law. This man suggested that the mother abort the child when conceived, has never acknowledged paternity, refused to keep even one visit with the DCF worker as preliminary to meeting his child for the first time, and has clearly voiced his desire to be uninvolved with her now or in the future. This same evidence compels the conclusion that there could be no on-goingparent-child relationship and Dr. Randall's testimony made clear that to allow further time to establish such relationship — even if Edward R. were to seek it, which he does not — would be detrimental to the child's best interests
As to Jacqueline L.: Both documentary and testimonial evidence offered by the petitioner establish by clear and convincing proof that in the year that elapsed between Mariah's birth and the date of trial, the mother has failed to achieve such degree of personal rehabilitation aswould encourage the belief that within a reasonable time, considering theage and needs of Mariah, she could assume a responsible position in thelife of the child. Even taking the mother's self-serving statements as true, that she has not abused any drugs since the institution of this action, there is no evidence in the record that would support a prediction that this brief period will be prolonged indefinitely. Even if a crystal ball permitted a prediction of a complete recovery from a twenty year history of addiction to a wide variety of substances, Dr. Randall was unequivocal that it would be damaging for this child to wait the necessary period of time before reunification could be accomplished. (If Jacqueline does succeed in such recovery, at the end of this period she can seek return of Kristina or her other three children, in none of whom have her parental rights been terminated.) Unfortunately, there is no evidence in this record on which such an optimistic prediction can be based: Jacqueline had at least two previous involvements with the APT Foundation's methadone program prior to her current one, (testimony of Peggy Carpenter) and was repeatedly admitted to both the inpatient and outpatient programs at CMHC in the past year. No evidence was offered that suggested she had any more structure in her life than the bleak description given by STAR upon her admission to the program in May, cited above, nor was there any evidence that she participates on any regular basis with Narcotics Anonymous, or had even sought a sponsor for herself in that program. She appears to have no family support, no employment, no structure in her life other than going to APT for her methadone six days a week and her weekly visit with Gail Chotiner at CMHC. She appears to be in better condition than she was in February of 2000 when she tried to obtain prescriptions for benzos from the psychiatrist who was court appointed in connection with Kristina's case, of which judicial notice has CT Page 14394 been taken. No evidence was offered that she has taken benzos since her release from incarceration after her arrest in July. Gail Chotiner testified that she had made "tremendous progress" in the four weeks that preceded her testimony, which was given six months after this termination petition was filed. Jacqueline's eloquent and obviously sincere plea to be able to work toward the return of her child cannot outweigh the right of that child to be assured of a safe and permanent home without waiting longer than her 12 month lifetime.
Disposition
Before this court may order termination of parental rights, it must consider the seven factors set forth in subsection (k) of Sec. 17a-112:
1. Services offered: Jacqueline was enmeshed in services addressing her dual diagnosis (borderline personality and chronic drug abuse) when Mariah was born and when Mariah was placed in the custody of DCF in December of 2001. Engaging in such services was encouraged by DCF, and assistance in securing housing was offered. Visitation was facilitated by the institution of a regular schedule of visiting, which was adhered to starting in July of 2002, and by the provision of a bus pass. No additional services appear to be required, nor were any requested. No services could be offered to a father who expressed no interest in utilizing them in order to care for this child. Edward R. failed to keep a single appointment with the DCF social worker that would have opened the door to the offer of such services, and has clearly indicated his disinterest in the child's future.
2. Reasonable efforts to reunite: DCF made efforts to reunite mother and child by recommending and encouraging utilization of mental health and substance abuse services. Even after filing this petition to terminate her parent rights, Jacqueline was encouraged to comply with the programs that she acknowledged were essential for her to be able to care for this child. But in the three months that followed the filing, she was discontinued unsatisfactorily from STAR and was again arrested. Under these circumstances, no further efforts could be made. So. long as Jacqueline continues to deny her addiction because, for the last year, she has only taken prescription drugs for her multiplicity of health and emotional problems (in addition to the high, non-diminishing dosage of methadone) there is nothing more DCF could have done to facilitate any possible reunification. No efforts could be offered to a putative father who has never acknowledged paternity, seen the child or expressed any interest in caring for her.
3. Court orders: There were no orders imposed in this case, other than CT Page 14395 for the mother to cooperate with the court-ordered evaluation, which she did prior to her discharge from STAR. While not ordered to visit, DCF encouraged regular contact. When not hospitalized, it was hard for the social worker to reach her, and after a number of missed weekly visits, the schedule was changed to bi-weekly. Since her release from prison in late July, she has visited regularly on this schedule.
4. Feelings and emotional ties with parent or other caretaker: With regular visitation, the child has become comfortable during visits with her mother and has what the social worker and the psychologist described as a satisfactory visiting relationship. It is only natural that the social worker observed a close bonding between the child and the foster parents who have had her care, and have proven their ability to meet her special needs, for half of her life. She has no relationship whatever with her putative father whom she has never seen.
5. Child's age: Mariah was close to her first birthday at the time of trial. She spent her first two months in the hospital due to the complications of being born addicted to methadone. She had a brief foster placement before being placed in April with foster parents who have expressed a willingness to adopt and have demonstrated an ability to meet her special needs. Waiting another year for Jacqueline to prove that her recent relative sobriety can be sustained would present a serious hazard to a child of this age, according to Dr. Randall.
6. Efforts to rehabilitate: Jacqueline claims to be currently making a sincere effort to adjust her circumstances in the hope that the child could be returned to her in the foreseeable future. Unfortunately these efforts started long after the child's birth, long after the child was committed to DCF as neglected, and even months after DCF filed this petition seeking termination of her parental rights. Faced with the threat of permanently losing those rights, Jacqueline has remained free of benzo abuse, at least since the time that CMHC secured the agreement from Nathan Smith that prescriptions would no longer be written for these drugs. She has a history, however, of securing such prescriptions from a wide variety of sources. Under similar circumstances, she was able to avoid termination of her rights in Kristina only by agreeing to a transfer of guardianship to a paternal relative. (If her recent sobriety can be sustained, she is free to seek reunification with that child.) She has visited Mariah, sporadically at first but regularly since the termination petition was filed. She has kept in contact with DCF. The father has done nothing to change his circumstances so as to be able to care for this child, and has made it clear in his brief contacts with the social worker that he chooses to be uninvolved in her future. CT Page 14396
7. Impediments to meaningful relationship: Neither unreasonable acts of either parent, nor economic circumstances have prevented either parent from maintaining a meaningful relationship with this child. What has prevented that relationship for Edward is his apparent disinterest in caring for the child. What has prevented it for Jacqueline is her twenty year history of abusing various drugs, her psychiatric diagnoses, her multiple physical problems which have necessitated her being supported by SSI, and the lack of both structure in her life and the support of friends or family. She has had a tragic life so far, but she is still young, and if she has sincerely begun recovery from her drug problems, she could look forward to seeking relationships with her other four children. Mariah cannot wait any longer for her to complete such recovery.
Judgement
Having considered the seven factors above, and having found by clear and convincing evidence that reasonable efforts have been made to reunite parents and child, that statutory grounds exist for terminating the rights of each parent, and that termination of parental rights and adoption by foster parents who have demonstrated love and ability to care for this child is in the best interests of that child, it is hereby Ordered that the parental rights of Jacqueline L. and Edward R. be, and hereby are,terminated. It is further ordered, that the Commissioner of DCF shall be appointed statutory parent for the purpose of securing the child's placement in adoption, and that such Commissioner shall, on or before December 10, 2002, file a written case plan including measurable objectives and time schedules, pursuant to subsection (o) of Sec. 17a-112. Written reports as to the progress of such case plan shall be submitted every three months thereafter (March 11, June 10 and September 9, 2003). If adoption has not been finalized by the latter date, the Commissioner shall also file with the September 9, 2003 report a Motion for Review of Plan for Terminated Child to be heard in this court at 10 a.m., November 4, 2002.
Entered at New Haven this 12th day of November, 2002
___________________ Frederica S. Brenneman, Judge Trial Referee CT Page 14397